IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

MEGAN E. MITCHELL and CLIFTON          *
JACKSON,
                                       *
        Plaintiffs,
                                       *
vs.                                              CASE NO.  3:12-CV-132 (CDL)
                                       *
HARVEY E. STEWART, DAVID
WHIRRELL, and MICHAEL MAXEY,           *

        Defendants.                    *

_____

O R D E R

        Lewis Grizzard, a Southern humorist and legendary columnist

for the Atlanta Journal-Constitution, observed that there's a

big difference between the words "naked" and "nekkid": "'naked'

means you don't have your clothes on.  'Nekkid' means you don't

have your clothes on and you're up to something."[1]  In this case,

Plaintiffs claim that Defendants arrested and transported them

to the jail with their breasts, buttocks, and genitalia exposed.

Whether Plaintiffs were "up to something" before Defendants

arrived at their home is irrelevant.  If a jury believes that

Plaintiffs were taken to jail substantially "naked," that jury

would be authorized to find that Defendants violated Plaintiffs'

---

[1] Lewis Grizzard, *Baring it All to Get to the Nekkid Truth*, Atlanta
Journal, Nov. 14, 1986, at C1.

clearly established Fourth Amendment rights.   Accordingly, Defendants are not entitled to immunity.[2]

SUMMARY JUDGMENT STANDARD

Plaintiffs sued Defendants under 42 U.S.C. § 1983 and state law, contending that Defendants violated their Fourth Amendment rights by entering their home without a warrant, arresting them without probable cause, and transporting them to the jail without allowing them to cover their breasts, buttocks, and genitalia.   Defendants seek summary judgment on Plaintiffs' federal law claims based on qualified immunity.[3]   Qualified immunity is a legal issue that ultimately must be decided by the Court as a matter of law, but any genuine factual disputes on which that legal determination is based must be resolved by a jury as the factfinder. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam).

As with any other summary judgment, summary judgment based on qualified immunity may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In determining whether a *genuine* dispute of

---

[2] As explained in the remainder of this Order, Defendants are entitled to qualified immunity on Plaintiffs' claims based on their entry into Plaintiffs' home and their arrest of Plaintiffs, but not on Plaintiffs' claims based on the manner of the arrest, which involved transporting Plaintiffs from their home to jail without allowing them to cover their breasts, genitalia, and buttocks.
[3] Defendants also seek summary judgment on Plaintiffs' state law claims based on official immunity under Georgia law.

*material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*  In the qualified immunity context, the Court must construe the factual record in favor of the plaintiff and determine whether that factual record would support a finding that the defendant's conduct violated clearly established law, thus depriving him of qualified immunity. *Tolan*, 134 S. Ct. at 1866.

Defendants seem to argue in their briefs that the Court must act as the factfinder.  Focusing primarily on *their* version of the facts and disputing facts that are supported by the record, Defendants argue that the Court should discount Plaintiffs' version of the facts and grant summary judgment based on Defendants' version of what happened.[4]  To the extent that Defendants imply that the Court at summary judgment must

---

[4] Plaintiffs certainly could have done a better job of citing the record.  But Defendants denied several of Plaintiffs' fact statements simply because Plaintiffs were slightly off on some of their pinpoint citations.  The point of the Court's local rule on fact statements is to help the Court determine whether a genuine dispute exists to be tried, not to provide counsel an opportunity to take tactical advantage of sloppy record citation by the other side.

evaluate which facts to believe or disbelieve, Defendants misunderstand Rule 56.  Qualified immunity does not change the Rule 56 summary judgment analysis.  The Court must still view the facts in the light most favorable to Plaintiffs and "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiffs, the record reveals the following.

Megan Mitchell and Nikki Beasley attended GED classes together at Athens Technical College.  Mitchell invited Beasley to her home after class on October 14, 2010.  Jackson, Mitchell's boyfriend, picked up Mitchell and Beasley and drove them to the home, where he lived with Mitchell.  After they arrived at the home, Mitchell drove Beasley to a convenience store called the Woodville Pantry, where Beasley purchased an alcoholic beverage.  Beasley was sixteen years old, and Mitchell knew it.

Beasley drank the alcohol in Mitchell's presence, and she took a pill outside Mitchell's presence.  Beasley began to feel sick, so she and Mitchell called Beasley's aunt for help.  Beasley's aunt met Beasley and Mitchell at the Woodville Pantry and took Beasley home.  Beasley's aunt decided that Beasley

needed medical attention, so she called 911, and Beasley was transported to the hospital by ambulance.

Defendant Whirrell, a Greene County sheriff's deputy, and his supervisor Defendant Stewart, a corporal, interviewed Beasley's aunt at the hospital. Beasley's aunt told Stewart and Whirrell that Beasley was "messed up" and had told the aunt that "she done drank . . . some alcohol and smoked some blunts." Yearwood Dep. 30:23-31:11, ECF No. 46; *accord id.* at 36:5-12. The aunt also told the officers that Beasley had consumed the alcohol and smoked the blunts while she was at Plaintiffs' home in Mitchell's care. *Id.* at 41:24-42:7. As far as the aunt knew, Beasley was alone with Mitchell at the house. *Id.* at 44:14-19. The aunt told the officers that Beasley had been at Plaintiffs' house with Mitchell and that when Mitchell drove Beasley to the convenience store to meet her, no one else was with them. *Id.* at 45:2-13. The aunt did not tell the officers that Jackson was present at the convenience store or that Jackson gave Beasley alcohol or drugs. *Id.* at 31:14-24.[5]

After interviewing Beasley's aunt, Stewart and Whirrell went to eat. Stewart called Defendant Maxey, another deputy

---

[5] Defendants contend that Beasley herself told Stewart and Whirrell that Mitchell and Jackson gave Beasley alcohol, marijuana, and Xanax. Stewart Dep. 110:15-25, ECF No. 49. But there is a factual dispute on this point. According to Darren Harland, a captain in the sheriff's department, Defendants "never talked to the victim" before they went to Plaintiffs' house; rather, they went solely based on the aunt's statement, which implicated only Mitchell. Harland Dep. 39:6-40:21, ECF No. 52.

under Stewart's supervision, and asked him to meet Stewart and Whirrell at the Woodville Pantry to plan their next steps. The three officers decided to go to Plaintiffs' residence to investigate a possible charge against Mitchell for contributing to the delinquency of a minor. Defendants did not have an arrest warrant or a search warrant.

At the time of the incidents giving rise to this action, Jackson was serving a probation sentence that included a "consent to search" condition: "Defendant shall submit to a search of his/her person, property, residence, or vehicle at any time of the day or night with or without consent or search warrant, whenever requested by a Probation Officer or any other peace officer and specifically consents to the use of any contraband seized as evidence in any court proceeding." Stewart Mot. for Summ. J. Ex. 8, Sentence in Case No. 08CR-376, Apr. 13, 2009, ECF No. 33-9; Stewart Mot. for Summ. J. Ex. 10, Sentence in Case No. 09CR-807, Feb. 8, 2010, ECF No. 33-11. Jackson contends that he did not knowingly consent to the search provision, but the record is undisputed that the sentencing judge asked Jackson if he understood and agreed to the provision, and Jackson said yes. Stewart Mot. for Summ. J. Ex. 9, Guilty Plea Hr'g Tr. 5:7-12, Apr. 13, 2009, ECF No. 33-10. Stewart contacted dispatch and learned of the waiver before Defendants went to Plaintiffs' home. Stewart Dep. 129:15-25.

When Defendants arrived at Plaintiffs' house, Stewart went to secure the back of the house. Whirrell went to the front door and knocked and said, "Greene County Sheriff's Department, open the door." Mitchell Decl. ¶ 19, ECF No. 60-1. Jackson said, "wait a minute, I'm putting on clothes." *Id.* At the time, Jackson and Mitchell were both naked. An officer demanded that someone "come and open the door now" and "we'll worry about clothes in a minute," so Jackson went to the front door. Jackson Dep. 80:6-9, ECF No. 42; Arrest Video 23:10:36–23:10:48, ECF No. 55. When Jackson reached the front door and had his hand on the knob, "the door just forcibly came open." Jackson Dep. 80:9-11. Jackson was still naked. An officer told Jackson to sit down on the couch in the living room, and he complied.

Mitchell was in the hallway when Defendants entered the house. Mitchell put on a sweater, but she did not have a chance to button it, and her breasts and genital area were exposed. Mitchell Decl. ¶¶ 20-22. Mitchell asked Whirrell if she could put on some clothes, but he said no and told Mitchell to sit on the couch. *Id.* ¶¶ 23-24; Whirrell Dep. 32:17-22. Once Plaintiffs were seated in the living room, Stewart entered the house. Although the house lights were out, each Defendant had a flashlight. According to Mitchell, Defendants pointed their "high beam" flashlights at her body, moving the light "from

[Mitchell's] genitals to [her] face," and she "saw each of them looking directly at [her] exposed body."  Mitchell Decl. ¶ 26.

The officers questioned Plaintiffs about Beasley.  Mitchell admitted that she had been with Beasley earlier in the day. Mitchell also admitted that Beasley drank alcohol in her presence.  Arrest Video 23:13:56-23:14-17 ("I mean, hell, she had it with her so I couldn't stop her from doing it."). Stewart told Plaintiffs that he was going to take a look around the house pursuant to the search clause in Jackson's probation sentence.  While Stewart was searching the residence, Mitchell again asked for clothes because she was cold and felt "very uncomfortable" because the officers "didn't even give [her] time to put on clothes."  Arrest Video 23:16:34-23:17:08.

During his search of Plaintiffs' bedroom, Stewart found an ashtray containing a substance that he suspected was marijuana. Stewart Dep. 143:8-13.  He placed the substance in a rubber glove and turned it over to Whirrell.  Stewart then went into the living room and reported that the substance "was in the bedroom where [Plaintiffs] were at."  Arrest Video 23:20:52-23:21:23.  Stewart asked who would take responsibility for the substance.  *Id.*  Mitchell said, "He don't even smoke.  I smoke." *Id.*  Mitchell then said, "I'm not gonna let him go to jail for nothing.  He don't smoke." *Id.*  Stewart construed this statement as an admission that the substance was marijuana.  Stewart

instructed Whirrell and Maxey to place Plaintiffs under arrest for contributing to the delinquency of a minor and possession of marijuana.

Whirrell handcuffed Mitchell, and Maxey handcuffed Jackson. Defendants contend that they did not "notice anything compromising or revealing about the appearance of either Jackson or Mitchell." Stewart's Statement of Material Facts ¶ 43, ECF No. 34. Mitchell asked for clothes at least twice while Defendants were at the house, and she told them that she was uncomfortable because she did not have on clothes. Mitchell also testified that although she was wearing a sweater, she did not have on any undergarments and the sweater was unbuttoned. And she testified that Defendants pointed their flashlights at her and looked directly at her exposed body.

Several neighbors gathered when Mitchell and Jackson were escorted from the house, and they saw that Mitchell did not have on any clothes under her open sweater. McCommons Decl. ¶ 8, ECF No. 60-3 ("I could see Megan had on an open sweater. I could see her breast and private area. I could see everything; she did not have on any shoes or clothing underneath. She walked to the police car with her head down."); M. Jackson Decl. ¶ 5, ECF No. 60-4 ("When the officers brought Megan Mitchell out she was in a sweater with nothing on underneath. I could see her breast."); Thomas Decl. ¶ 5(2), ECF No. 60-5 ("Megan had on an open jacket

with buttons. She did not have on any bottoms or anything underneath the jacket. I could see her breast and private area."). When Stewart's supervisor questioned him about why Mitchell was transported to the jail in just the sweater, Stewart callously responded "you are riding like you are hiding." Harland Dep. 46:7-23, ECF No. 52.

When Mitchell arrived at the jail, she was not immediately given clothes, and at least two male inmates saw her exposed body. Davis Decl. ¶ 3, ECF No. 60-2 ("Through the window I saw Megan Mitchell in a little brown shirt with her breast and genitals exposed. I saw her standing in the area you are searched at before you enter the jail. The other trustees and I took turns looking out the window at Megan."); Mallory Decl. ¶ 4, ECF No. 60-7 ("When I saw Megan Mitchell she was sitting in the first holding cell inside the jail. I could see her breast through the open sweater she had on.").

From the time Defendants entered the house to the time Maxey prepared to escort Jackson out of the house, Jackson was completely naked. Jackson Dep. 117:16-24. When Maxey was preparing to escort Jackson from the house, Jackson asked if he could get some clothes and told Maxey that it was inappropriate to take him out of his house naked. Jackson Dep. 149:6-12. Jackson did retrieve a jacket and put it on before Maxey escorted him out of the house, but it was a short jacket that

left Jackson's buttocks and genitals exposed. *Id.* at 150:15-23. Several neighbors saw that Jackson did not have any clothes on under the short jacket. McCommons Decl. ¶ 5 ("I could see Cliff had on a white jacket with nothing underneath. He was naked. He did not have on any shoes or pants."); M. Jackson Decl. ¶ 4 ("When I arrived the officers were bringing [Jackson] out in nothing but a white coat. I could see everything, including his private area."); Thomas Decl. ¶ 5(1) ("Cliff had on a jacket with nothing underneath. I could see his genital area as he walked to the police car parked on the street."). When Jackson arrived at the jail, Maxey got him some pants and slipped them onto Jackson before he exited the patrol car.

DISCUSSION

## I. Plaintiffs' Fourth Amendment Claims

Plaintiffs claim that Defendants violated the Fourth Amendment to the United States Constitution when they entered and searched their home without a warrant, arrested them without probable cause, and transported them to the jail with their buttocks, breasts, and genitalia exposed. Defendants assert the defense of qualified immunity. Qualified immunity protects government officials acting within the scope of their discretionary authority "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

11

would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Gennusa v. Canova*, No. 12-13871, 2014 WL 1363541, at *2 (11th Cir. Apr. 8, 2014).

Here, Plaintiffs do not dispute that Defendants were acting within the scope of their discretionary authority when they entered Plaintiffs' home, searched it, and arrested Plaintiffs. Plaintiffs thus "bear the burden of establishing that qualified immunity is not appropriate." *Id.*  To meet their burden, Plaintiffs must show that (1) Defendants violated the Fourth Amendment, and (2) at the time of Defendants' actions, "it was clearly established that the challenged conduct was unconstitutional." *Id.*  "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, No. 12-1117, 2014 WL 2178335, at *9 (U.S. May 27, 2014).

A.   Warrantless Entry Into and Search of Plaintiffs' Home

Defendants did not have a warrant when they entered Plaintiffs' home.  Under the Fourth Amendment, "searches and

seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984). One of the issues presented by Defendants' motions is whether an exception to the warrant requirement applies here. Such exceptions are "few in number and carefully delineated." *Id.* (internal quotation marks omitted). Defendants rely on the "voluntary consent to enter exception." *See Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1328 (11th Cir. 2006) (explaining exceptions to warrant requirement).[6]

Defendants did not directly seek consent from Plaintiffs before entering their home. Instead, they relied on a "consent to search" provision which Plaintiff Jackson agreed to as part of a previous criminal judgment against him. Jackson argues that he did not voluntarily consent to the Fourth Amendment waiver, and Mitchell maintains that even if he did, Jackson's "consent" did not apply to her.

It is undisputed that a "consent to search" provision was a condition of Jackson's probation relating to a previous criminal offense and that the condition was in effect when Defendants

---

[6] Defendants do not seriously argue that the other exception, "exigent circumstances," applies. Application of that exception in the context of a home entry is rarely sanctioned when there is probable cause to believe that only a minor offense has been committed. *See Welsh*, 466 U.S. at 753. Here, Defendants were investigating the misdemeanor offense of contributing to the delinquency of a minor. Moreover, Defendants' decision to go eat before devising a plan to enter Plaintiffs' home directly contradicts any suggestion that exigent circumstances justified their failure to obtain a warrant.

entered Plaintiffs' home.  It is also undisputed that Defendants were aware of the provision and relied on it when they entered Plaintiffs' home without a warrant.  Relying on *Fox v. State*, 527 S.E.2d 847, 272 Ga. 163 (2000), Jackson argues that he never *voluntarily* agreed to the consent to search/waiver of Fourth Amendment rights provision.  Jackson's reliance on *Fox* is misplaced.  In *Fox*, the Georgia Supreme Court found that a Fourth Amendment waiver provision was invalid because the probationer was not informed of the search provision until after he was sentenced and therefore did not have an opportunity "to consider whether prison was an acceptable alternative in light of this condition of probation."  *Id.* at 849, 272 Ga. at 165. Here, the prosecutor disclosed the search condition to Jackson before the sentencing.  Stewart Mot. for Summ. J. Ex. 9, Guilty Plea Hr'g Tr. 2:14-24, Apr. 13, 2009, ECF No. 33-10.  The sentencing judge specifically asked Jackson if the prosecutor "went over this search provision," and Jackson responded, "Yes, sir."  *Id.* at 5:7-10.  The judge also asked Jackson if he agreed to the provision, and Jackson said yes.  *Id.* at 5:11-12.  For these reasons, the Court concludes that Jackson voluntarily agreed to the Fourth Amendment waiver as a condition of his probation.

The next issue is whether the consent to search/Fourth Amendment waiver applies under the circumstances confronting the

Defendants when they entered Plaintiffs' home without a warrant. If a probationer voluntarily agrees to a "consent to search" provision as a term of his probation and officers reasonably suspect that the probationer is engaged in criminal activity, the courts will uphold a search of the probationer's residence. *United States v. Knights*, 534 U.S. 112, 119-20 (2001) (finding that Fourth Amendment waiver was a reasonable term of probation); *Allen v. State*, 369 S.E.2d 909, 910, 258 Ga. 424, 424 (1988) (upholding Fourth Amendment waiver where probationer agreed to the waiver as part of a plea bargain). This rule is rooted in the principle that "probationers do not enjoy the absolute liberty to which every citizen is entitled" because "a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Knights*, 534 U.S. at 119 (internal quotation marks omitted). When the courts determine the reasonableness of a search, they must assess, "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* On one side of the balance, a probationer who accepts a search condition as a condition of probation has a diminished expectation of privacy. *Id.* at 119-20. On the other side of the balance is the government's concern that a probationer "will be more likely to engage in

criminal conduct than an ordinary member of the community." *Id.* at 121.

The government "may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* Thus, it is clear that a probationer's consent to search probation condition extends to situations where officers (a) are conducting the search to monitor whether the probationer is complying with probation restrictions, *id.* at 119-20, or (b) have a reasonable suspicion that the probationer is engaged in criminal activity, *id.* at 121. It is less clear whether these principles authorize what Defendants did here: treat a probationer's consent to search provision as a complete waiver that permits a search of the probationer's house at any time, even when (1) the officers are not conducting the search to monitor the probationer and (2) the officers only suspect the probationer's cotenant—not the probationer himself—may have committed a misdemeanor. But the Court does not need to determine today whether Defendants' conduct here actually violated the Fourth Amendment.

To lose qualified immunity, an officer must violate *clearly established* law. For a right to be clearly established, the constitutional question must be "beyond debate." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (per curiam) (internal quotation marks omitted). Plaintiffs pointed the Court to no authority clearly establishing that a probationer's consent to a search provision is *not* a complete waiver of the probationer's Fourth Amendment rights. Significantly, both the United States Supreme Court and the Georgia Supreme Court have left this question open. In *Knights*, the United States Supreme Court emphasized that it was not deciding whether acceptance of a search condition constituted consent in the "sense of a complete waiver of" a probationer's Fourth Amendment rights. *Knights*, 534 U.S. at 118. In *Brooks*, the Georgia Supreme Court left "for another day the question of whether a probation search must be supported by reasonable grounds despite a Fourth Amendment waiver." *Brooks*, 677 S.E.2d at 68, 285 Ga. at 424. And at least two Georgia Supreme Court justices would have concluded in *Brooks* that a "consent to search" probation condition constitutes a complete waiver of the probationer's Fourth Amendment rights. *Brooks*, 677 S.E.2d at 70-71, 285 Ga. at 427 (Melton, J., concurring).

As previously explained, "a defendant cannot be said to have violated a clearly established right unless the right's

contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 2014 WL 2178335, at *9. Even if a probationer's agreement to a consent to search condition does *not* constitute a complete Fourth Amendment waiver, that principle was not clearly established at the time of the events giving rise to this action. Therefore, Defendants cannot be deemed to have known that their reliance on Jackson's consent to search provision violated Plaintiffs' clearly established Fourth Amendment rights. Consequently, Defendants are entitled to qualified immunity as to claims based on their reliance on Jackson's consent to search probation condition.

The final issue is whether Jackson's consent applies to his cohabitator, Mitchell. It is well established that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." *Fernandez v. California*, 134 S. Ct. 1126, 1133 (2014). There is a narrow exception: "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Georgia v. Randolph*, 547 U.S. 103, 122-123 (2006); *accord Fernandez*, 134 S. Ct. 1134 (emphasizing that *Randolph* does not extend to cases where the objector is not present and objecting). Mitchell has

pointed to no evidence that she refused consent when Defendants entered the house.

Even if the Fourth Amendment did not authorize the application of Jackson's consent to Mitchell, the Court finds that such a principle was not clearly established when Defendants entered the home. Accordingly, Defendants are entitled to qualified immunity as to Plaintiffs' claims that the warrantless entry into their home violated the Fourth Amendment.

B.   Plaintiffs' Arrest

Plaintiffs also maintain that even if Defendants lawfully entered their home, they lacked probable cause to arrest Plaintiffs. A warrantless arrest without probable cause violates the Fourth Amendment, "'but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest.'" *Morris v. Town of Lexington, Ala.*, No. 13-10434, 2014 WL 2111081, at *5 (11th Cir. 2014) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)). Probable cause exists "'when the facts and circumstances within the officer's knowledge . . . would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir.2003)) (alteration in original). "For an officer to be entitled to qualified immunity, however, he need not have

actual probable cause; 'arguable' probable cause will suffice."
*Id.*   An officer has arguable probable cause if "'reasonable
officers in the same circumstances and possessing the same
knowledge as the Defendants could have believed that probable
cause existed to arrest Plaintiff.'"   *Id.* (quoting *Kingsland v.
City of Miami*, 382 F.3d 1220, 1232 (11th Cir.2004)).

Defendants arrested Plaintiffs for contributing to the
delinquency of a minor under O.C.G.A. § 16-12-1 and for
marijuana possession under O.C.G.A. § 16-13-30.   Georgia law
makes it "unlawful for any person to possess, have under his or
her control, manufacture, deliver, distribute, dispense,
administer, purchase, sell, or possess with intent to distribute
marijuana."   O.C.G.A. § 16-13-30(j)(1).   When Stewart searched
the house, he found a substance in an ashtray in Plaintiffs'
bedroom that he believed was marijuana.   Plaintiffs argue that
it was unreasonable for Stewart to suspect that the substance
was marijuana and note that the substance was later tested and
found not to be marijuana.   Plaintiffs, however, have failed to
point to persuasive evidence that Stewart's suspicion at the
time of their arrest was unreasonable.

Mitchell's own statements bolstered Stewart's belief that
the substance was marijuana: when Stewart asked who would take
responsibility for the substance, Mitchell said, "He don't even
smoke.   I smoke."   Arrest Video 23:20:52-23:21:23.   She then

said, "I'm not gonna let him go to jail for nothing.  He don't smoke."  *Id.*  After the arrest, Mitchell explained that when she took responsibility for the substance, she was referring to a tobacco cigarette.  Mitchell Dep. vol. II 12:5-18, ECF No. 84; *id.* at 87:15-18 (stating that Mitchell knew that Stewart found something but did not know what it was); *id.* at 88:22-89:3 (stating that Mitchell did not know whether the deputies were investigating suspected marijuana).  Whatever Mitchell's subjective beliefs were when she made statements about the substance, a reasonable officer in Stewart's position certainly could have believed that Mitchell was taking responsibility for an illegal substance, such as marijuana, because Mitchell said that she did not want Jackson to go to jail for it.   And because both Plaintiffs lived at the house and shared the bedroom where Stewart found the suspected marijuana, an officer in Stewart's position could reasonably believe that both Plaintiffs possessed marijuana.  *See, e.g., United States v. Thompson*, 473 F.3d 1137, 1142 (11th Cir. 2006) ("Constructive possession exists where the defendant had dominion or control over the drugs or over the premises where the drugs were located.").  The Court thus finds that Defendants had arguable probable cause to arrest Plaintiffs for marijuana possession.  Given this finding, the Court does not need to decide whether Defendants also had arguable probable cause to believe that

Plaintiffs had violated Georgia's contributing to the delinquency of a minor statute. Defendants are entitled to qualified immunity on Plaintiffs' claims that Defendants violated their Fourth Amendment rights by arresting them.

> ### C.    The Manner of the Arrests

Plaintiffs maintain that even if Defendants lawfully entered their home and arrested them, they violated clearly established law when they took Plaintiffs out of their home without sufficient covering and without a legitimate reason for doing so. The Court agrees.

If an officer has probable cause to arrest a person, the seizure must still be reasonable. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). "To determine the constitutionality of a seizure," the Court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (internal quotation marks omitted). The reasonableness of a seizure "depends on not only when a seizure is made, but also how it is carried out." *Id.*

Defendants argue that they were unaware of the extent to which Plaintiffs' bodies were exposed during the arrest. But there is plenty of evidence in the record that contradicts Defendants' contention, particularly when the evidence is viewed in the light most favorable to Plaintiffs as required at this

stage of the litigation. *See Tolan*, 134 S. Ct. at 1866 (emphasizing that a court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment"). The evidence viewed in the light most favorable to Plaintiffs shows that (1) Mitchell was naked except for a sweater that did not cover her private areas; (2) Jackson was naked except for a jacket that did not cover his private areas; (3) before the officers arrested Plaintiffs and escorted them from the house, the officers pointed their flashlights directly at Plaintiffs and looked at their exposed bodies; (4) each Plaintiff asked Defendants for clothes at least twice; and (5) Plaintiffs' neighbors and jail inmates could see Plaintiffs' exposed bodies. These facts must be accepted when deciding Defendants' motion for summary judgment.

The next question is whether Plaintiffs had a clearly established constitutional right to bodily privacy that Defendants violated when they escorted Plaintiffs out of their house nearly naked. Plaintiffs may "demonstrate that the contours of the right were clearly established" by showing "that a materially similar case has already been decided" by the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit Court, or the Georgia Supreme Court. *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (internal quotation marks omitted). Plaintiffs "also may show that a

23

constitutional right was clearly established through a broader, clearly established principle [that] should control the novel facts [of the] situation." *Id.* at 1256 (alterations in original) (internal quotation marks omitted). "[T]he principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Id.* (internal quotation marks omitted). Plaintiffs may also defeat a qualified immunity defense by showing that "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* at 1257 (internal quotation marks omitted).

Here, Plaintiffs point to the well established principle that even incarcerated prisoners "retain a constitutional right to bodily privacy." *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993).[7] The Eleventh Circuit emphasized that "most

---

[7] Defendants contend that *Fortner* "den[ies] that a prisoner has any right to bodily privacy." Stewart's Reply to Jackson's Resp. Br. 9, ECF No. 80. The Eleventh Circuit in *Fortner* did grant officers qualified immunity because, as of 1993, neither the Eleventh Circuit "nor the Supreme Court had recognized that a prisoner retains a constitutional right to bodily privacy." *Fortner*, 983 F.3d at 1028. Defendants apparently stopped reading there. Had Defendants read the rest of *Fortner*, they would have learned that although the officers received qualified immunity, the court also addressed the prisoners' claim for injunctive relief and squarely held "that prisoners retain a constitutional right to bodily privacy." *Id.* at 1030.

people have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Id.* at 1030 (internal quotation marks omitted). Therefore, a prison regulation that impinges on the prisoners' constitutional right to bodily privacy must pass a "reasonableness test."[8] *Id.* After it decided *Fortner*, the Eleventh Circuit "reaffirmed the privacy rights of prisoners emphasizing the harm of compelled nudity." *Boxer X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006).

The Court is satisfied that *Fortner* and the cases that follow it confirm a broad, clearly established principle that individuals who have been placed in police custody have a constitutional right to bodily privacy. If convicted prisoners *retain* a constitutional right to bodily privacy *while in jail*, then they must have had that right before they were incarcerated, which means that free citizens enjoy at least the same right to bodily privacy. And if a prison guard must have a legitimate reason for impinging an inmate's right to bodily privacy, then an arresting officer certainly must have a legitimate reason for violating the bodily privacy rights of an arrestee.

---

[8] In *Fortner*, male prisoners sought "injunctive relief prohibiting female correctional officers from assignments that allow the officers to view the [prisoners] nude in their living quarters." *Fortner*, 983 F.3d at 1026.

Defendants did not offer any legitimate law enforcement purpose for escorting Plaintiffs out of their home without enough clothes to cover their private areas. Defendants simply contend that they did not notice that Plaintiffs were unclothed. While that argument may rescue them at trial (if a jury believes them), Defendants' fact-based argument cannot save them at summary judgment. If a jury believes Plaintiffs' version of what happened, it would be authorized to find that Defendants knew that Plaintiffs were exposed yet escorted them out of the house without any reasonable belief that it would have been unsafe or impracticable to allow Plaintiffs to put on some clothes first. Under these circumstances, Defendants should have known better. Defendants are not entitled to qualified immunity on Plaintiffs' Fourth Amendment claims relating to the manner of their arrests.

## II.  State Law Claims

Defendants claim that they are entitled to official immunity on Plaintiffs' state law claims. Official immunity under Georgia law protects public agents from personal liability "for their discretionary acts unless they are done with malice or intent to injure." *City of Atlanta v. Shavers*, 756 S.E.2d 204, 206 (Ga. Ct. App. 2014) (internal quotation marks omitted). "A showing of actual malice is required." *Id.* (internal quotation marks omitted). "[A]ctual malice requires a

deliberate intention to do wrong." *Id.* (internal quotation marks omitted). In *Shavers*, the Georgia Court of Appeals concluded that an officer was not entitled to official immunity on the plaintiff's false imprisonment claim because the evidence viewed in the light most favorable to the plaintiff established that the officer arrested the plaintiff even though he knew there was no probable cause for the arrest. *Id.* at 207.

Here, under Plaintiffs' version of the facts, a jury could conclude that Defendants knew that Plaintiffs were nearly naked and that there was no legitimate purpose for parading them in front of their neighbors and to the jail that way, but Defendants did it anyway. Thus, a jury could reasonably conclude that Defendants deliberately intended to do a wrongful act. *Id.* Defendants are therefore not entitled to official immunity on Plaintiffs' state law claims.

For similar reasons, Defendants are not entitled to summary judgment on Plaintiffs' claims for punitive damages. *See* O.C.G.A. § 51-12-5.1(b) (permitting punitive damages under Georgia law where "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.").[9]

---

[9] Plaintiffs' punitive damages claims related to their federal §1983 manner of arrest claims also survive summary judgment. *See Smith v.*

27

CONCLUSION

As discussed above, Defendants' summary judgment motions (ECF Nos. 33 & 37) are granted in part and denied in part. Summary judgment is granted in favor of Defendants based on qualified and official immunity as to Plaintiffs' claims arising out of Defendants' entry into Plaintiffs' home and the decision to arrest them. Summary judgment is denied as to Plaintiffs' § 1983 Fourth Amendment and state law claims that relate to the manner of Plaintiffs' arrests, including Plaintiffs' claims for punitive damages.

IT IS SO ORDERED, this 12th day of June, 2014.

S/Clay D. Land
_____
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

*Wade*, 461 U.S. 30, 56 (1983) (holding that a jury may assess punitive damages in a 42 U.S.C. § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").